UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ADAM YEOMAN,

                    Plaintiff,

          v.                                    Case No. 17-cv-1199-pp

DR. JEFFREY MANLOVE, *et al.*,

                    Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION TO WITHDRAW MOTION TO APPOINT COUNSEL (DKT. NO. 59), DEEMING WITHDRAWN PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. NO. 58) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 27) AND DISMISSING CASE**

The plaintiff, a Wisconsin state prisoner who is representing himself, filed an amended complaint under 42 U.S.C. §1983, alleging that the defendants violated his civil rights at the Waupun Correctional Institution. Dkt. No. 8. The court screened the amended complaint and allowed the plaintiff to proceed with an Eighth Amendment claim that Doctor Jeffrey Manlove, Nurse Gail Waltz and Sergeant Jodi Tritt showed deliberate indifference toward his serious medical condition by failing to provide treatment for his broken forearm for almost an entire week. Dkt. No. 10 at 7. The court also allowed the plaintiff to proceed with a supplemental state law medical malpractice claim against Manlove and Waltz. Dkt. No. 33 at 2. This order resolves the defendants' motion for summary judgment, dkt. no. 27, and the plaintiff's motion to appoint counsel, dkt. no. 58.

1

# I.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 27)

## A.   Facts

The plaintiff is an inmate at Waupun. Dkt. No. 47 at ¶1. The defendants are Department of Corrections employees who worked at Waupun: Jodi Tritt is a sergeant, Gail Waltz is a nurse and Jeffrey Manlove is a doctor. Id. at ¶¶2-4.

On January 22, 2015, the plaintiff was playing basketball during recreation. Id. at ¶6. He ran into a brick wall and heard his forearm snap. Id. at ¶7. The snap "clearly sounded like a break." Id. The plaintiff's fingers went numb and he could not move them; "[t]he pain was shooting, throbbing, and piercing through his arm entirely, which was untolerable." Id. at ¶8.

The plaintiff told Tritt about his injury. Id. at ¶9. Tritt "had a dismissive attitude and refused to contact health services, stating you don't look all that hurt to me." Dkt. No. 48 at ¶13. Another officer "stepped in" and called for an emergency escort to health services. Dkt. No. 47 at ¶10.

At health services, Waltz evaluated the plaintiff's arm. Id. at ¶11. The plaintiff told Waltz what had happened. Id. at ¶¶14-15. According to the plaintiff, Waltz "began to have a dismissive attitude" toward his injury regardless of how he described it. Id. at ¶16. When the plaintiff told her that his forearm was broken, Waltz "documented that [he] only had a superficial scratch with redness around the area, telling [him] she did not believe [his] arm was broken, not evaluating [his] injury specifically to his concern and refused to provide [him] pain medication, ice, or any additional medical service." Id. Waltz stated that she didn't think the arm was broken and that the plaintiff should use whatever pain medication or ice he already had in his cell. Id. at ¶17. The plaintiff told Waltz that he didn't have ice or medication in his cell but

2

she still "refused to provide [the plaintiff] pain medication, ice, or any additional medical service." Id.

According to Waltz, she examined the plaintiff and documented that he complained of 10/10 pain; had a superficial scratch 0.5 cm in length with surrounding redness; had numbness but was able to move his fingers after ten minutes; had limited rotation; and, had some swelling and bruising. Dkt. No. 31 at ¶¶9-10; see also Dkt. No. 31-1 at 1-2. She prescribed a non-narcotic analgesic (Tylenol), an ice bag, and a sling. Dkt. No. 31 at ¶¶11-13; see also dkt. no. 31-1 at 2. She also provided the plaintiff with education for rest, elevating the arm and applying ice. Id. Waltz notes that as a nurse, she can only prescribe non-narcotic analgesics. Dkt. No. 31 at ¶19. She also notes that although she had ordered a sling, there wasn't one in stock. Id. at ¶11. Instead, she gave the plaintiff a shoulder immobilizer, the only immobilizer available at the time. Id.

Waltz then stated that the plaintiff "was good to go," and according to the plaintiff, "attempt[ed] to have [the plaintiff] forcefully removed without further treatment." Dkt. No. 47 at ¶18. The plaintiff states he "became angry demanding an x-ray or [to] see a doctor." Id. Waltz explains that she does not have authority to order an x-ray or off-site medical care when a physician is onsite, and that she already had referred the plaintiff to Dr. Manlove for that same day. Dkt. No. 31 at ¶¶14, 16-19; see also Dkt. No. 31-1 at 2 (ordering "stat referral on-site").

According to the plaintiff, Manlove "overheard [the plaintiff's] loud complaints" and came over to ask about his injury. Dkt. No. 47 at ¶19. The plaintiff told Manlove what happened. Id. at ¶ 20. Manlove examined the plaintiff's arm and thought that the plaintiff had a "contusion of the forearm" (a

3

bruise). Dkt. No. 43 at ¶¶2-3; see also Dkt. No. 31-1 at 4. Manlove's progress notes from January 22, 2015 indicate "no deformity or swelling[;] have abrasion mid-ulnar on part of forearm[;] tender mid ulnar but no palpable defect or deformity[;] pain in protraction . . . ." Dkt. No. 31-1 at 4. Like Waltz, Manlove ordered "ice, sling, x-ray." Id.

Manlove states that a non-narcotic analgesic was an appropriate treatment given that the "working diagnosis" at that time was a contusion. Dkt. No. 43 at ¶3. He states that a shoulder immobilizer was a medically appropriate substitute for a sling because "[a]nything to support and immobilize would be sufficient" for a possible fracture. Id. at ¶4. He explains that "immobilization" would have been the initial treatment even if his "working diagnosis" had been a fracture. Id. at ¶¶4, 9.

Manlove further states that although he did not believe the plaintiff's arm was broken, he ordered an x-ray to rule out an "unapparent fracture" (a fracture with no "visible or palpable bone defect."). Dkt. No. 30 at ¶10. He explains that he needed an x-ray to make a "definitive diagnosis" and that his "working diagnoses" at the time was a contusion. Dkt. No. 43 at ¶5. Manlove also notes that it is possible to splint an arm before a fracture is confirmed, but it is not "routine" or "usual practice" to do so until there is a "definitive diagnosis." Id. at ¶10.

The next available x-ray at the institution was four days later, on January 26, 2015. Dkt. No. 43 at ¶6. The plaintiff protested waiting four days for an x-ray and requested an x-ray "immediately," pointing out that the x-ray machine was "located in a room directly across the hall" from where the plaintiff was being treated. Dkt. No. 48 at ¶¶30-32. The plaintiff asserts that

4

Manlove had the authority to send him to a hospital if the x-ray machine at Waupun was unavailable. Id. at ¶33.

Manlove denied the request for an "immediate" x-ray. Id. at ¶¶34-37. He explains that it is "normal practice" to schedule x-rays when "available" and that the plaintiff's injury did not warrant a departure from normal practice. Dkt. No. 30 at ¶15. Manlove says that when there is no visible or palpable bone defect, the clinical probability of a fracture is low and waiting for the next available x-ray is reasonable. Id. at ¶¶16-17. According to the plaintiff, Manlove then told the plaintiff that "[he] would not be receiving any more medical treatment" that day and asked him to leave. Dkt. No. 48 at ¶37.

During the four-day wait to get an x-ray, the plaintiff received the treatment Waltz and Manlove prescribed (a non-narcotic analgesic, ice and a shoulder immobilizer). Dkt. No. 43 at ¶3. On January 26, 2015, the plaintiff went to health services to get an x-ray. Dkt. No. 29 at ¶18. The x-ray showed that the plaintiff had a "nondisplaced fracture of the midshaft of the right ulna." Id. at ¶19. According to Manlove, the x-ray showed "good alignment of the fracture" and that it had begun healing without adverse consequences. Id. at ¶31. Manlove prescribed stronger pain medication (Vicodin), an Ace splint and an off-site referral for further treatment by a specialist, Dr. Grossman. Id. at ¶20; see also Dkt. No. 43, ¶¶13-14.

Two days later, on January 28, 2015, the plaintiff went to the Fond du Lac Regional Clinic, where Dr. Grossman applied an "ulnar gutter splint cast" and provided additional cast padding. Dkt. No. 29 at ¶21. Dr. Grossman also ordered another x-ray to confirm that there was no fracture of the wrist or elbow. Id. at ¶22.

The day after the health services x-ray—January 27, 2015—the plaintiff filed an offender complaint about Tritt's dismissive attitude toward his injuries. Id. at ¶46; see also Dkt. No. 32-2 at 8. Institution Complaint Examiner ("ICE") J. Muenchow returned the complaint with instructions that the plaintiff first should address the issue with the security director. Dkt. No. 29 at ¶47; Dkt. No. 32-3. The letter instructed the plaintiff to

> provide this office with written documentation of your attempts to resolve the issue as directed. Written documentation means responses to interview requests and other written responses from the staff contacted.

Dkt. No. 32-3 at 1.

The letter also informed the plaintiff that he could resubmit the offender complaint after following the instructions above. Id. The plaintiff states that he contacted the security director but did not receive a written response. Dkt. No. 49 at ¶47. Two months later, on March 19, 2015, the plaintiff resubmitted his offender complaint without any other attachments. Dkt. No. 29 at ¶48.

ICE Joanne Bovee rejected the plaintiff's inmate complaint because it was beyond the fourteen-day calendar limit. Id. at ¶49. Bovee states that she would have waived the fourteen-day calendar limit for "good cause" if the plaintiff had followed the instructions in the letter and attached written documentation or an explanation of his attempts to contact the security director to resolve the issue. Id. The plaintiff requested review of the rejected complaint, but the reviewing authority found that the complaint was appropriately rejected. Id. at ¶50.

The plaintiff's fracture "completely healed" within five or six weeks, on or around March 26, 2015. Dkt. No. 43 at ¶15; see also Dkt. No. 47 at ¶¶35-36. The plaintiff states that after receiving treatment on January 26, 215, "there's

pretty much no pain and suffering besides the fact that they didn't give me a sling, which might have hindered or might not have." Dkt. No. 44-1 at 49:14-16. The plaintiff also states, "well, as far as long-term quality of life, there's not—there's not going to be too much affected." Id. at 50:16-18. Manlove agreed and stated that the plaintiff "sustained no permanent injury due to not receiving the arm splint on [January 22, 2015]." Dkt. No. 30 at ¶20.

 B. <u>Discussion</u>

  1. *Summary Judgment Standard*

 "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986); <u>Ames v. Home Depot U.S.A., Inc.</u>, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." <u>Anderson</u>, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

 A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

  (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

7

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### 2. *Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act ("PLRA") provides in part that "[n]o action shall be brought with respect to prison conditions under § 1983. . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C § 1997e(a). The exhaustion rule gives prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court and it produces a "useful administrative record" for the district court to rely on. See Jones v. Bock, 549 U.S. 199, 204 (2007) (citing Woodford v. Ngo, 548 U.S. 81, 94-95 (2006)). A district court "lacks discretion to resolve the claim on the merits" if the prisoner fails to properly exhaust administrative remedies. Perez v. Wis. Dep't of Corr., 182 F.3d 532, 535 (7th Cir. 1999).

A prisoner must file complaints and appeals "in the place, and at the time, the prison's administrative rules require." Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002). An inmate must use "all steps that the agency holds out" and must "do[] so *properly* (so that the agency addresses the issues on the merits)." Id. at 1034. An inmate complaint that is not addressed on the merits is not exhausted. Id.

Defendant Tritt asks the court to dismiss her as a defendant based on the plaintiff's failure to exhaust administrative remedies before suing her in federal court. Dkt. No. 28 at 5-8. She asserts that Muenchow gave the plaintiff specific instructions about how to resubmit his inmate complaint (that the

8

plaintiff was supposed to include written documentation showing that he attempted to resolve the issue with the security director), and that the plaintiff failed to follow those instructions. Id. at 8. Tritt argues that if the plaintiff had complied with Muenchow's instructions, Bovee would have extended the fourteen-day deadline and would have decided the inmate complaint on the merits. Id.

The plaintiff, on the other hand, explains that the security director did not respond to his attempts to resolve the issue, so he was unable to attach written documentation showing that he attempted to resolve the issue with the security director. Dkt. No. 50 at 2. He asserts that Muenchow's letter instructed him to "wait a reasonable amount of time for a reply" before refiling, so he waited two months. Id.

Although Tritt now takes the position that the plaintiff should have provided an "explanation" that the security director did not respond to his attempts to resolve the issue in his resubmitted inmate complaint, dkt. no. 28 at 8, Muenchow's letter did not specifically instruct him to do so, dkt. no. 32-3. The letter provided the following directions:

> --    Before this complaint is accepted, you need to attempt to resolve the issue by contacting Mr. Meli, Security Director [DOC 310.09(4)].
>
> --    Other, see comments below.
>
> --    The ICE is also directing you to provide this office with written documentation of your attempts to resolve the issue as directed. Written documentation manes responses to interview requests and other written responses from staff contacted.
>
> *Sgt. Tritt*  This is a return, not a rejection, and you have the opportunity to fix identified errors. You may resubmit your complaint after you have completed the following and/or above instructions.

9

Please inform Mr. Meli that you were instructed to contact him by the Inmate Complaint Department regarding the issue presented in this submission. If you feel that this staff member does not address the issue to your satisfaction, you may resubmit the complaint. Please wait a reasonable amount of time for a reply before you resubmit your complaint. We request that you include any correspondence to and/or from Mr. Meli with your resubmission. Please inform the Complaint Department that you are resubmitting your complaint for review and use the original complaint form.

Dkt. No. 32-3.

The plaintiff appears to have done exactly what the complaint examiner told him to do. He tried to contact the security director. He waited two months for a response; given that the security director is responsible for responding to all inmate requests regarding staff issues, two months is a reasonable amount of time for the plaintiff to have waited. This is particularly true because the complaint examiner's letter did not provide guidelines on what would have been a "reasonable" amount of time to wait for a response from the security director. The plaintiff then resubmitted his inmate complaint. He did not attach written documentation, because he did not have the kind of written documentation the complaint examiner described—"responses to interview requests and other written responses from the staff contacted." No staff responded to him, so he could not attach any staff responses. And the letter did not say, "If you don't receive a response, provide a written explanation for the steps you took to contact staff." Because the plaintiff did what the letter told him to do, the court finds that the plaintiff exhausted the administrative remedies that were available to him.

3. *Eighth Amendment Deliberate Indifference*

"[T]he Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests

10

would serve any penological purpose.'" Petties v. Carter, 836 F.3d 722, 727 (7th Cir. 2016) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)). "To determine if the Eighth Amendment has been violated in the prison medical context, [the court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." Id. at 727–28 (citing Farmer v. Brennan, 511 U.S. 825, 843 (1994)).

"A medical need is serious if it is life threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities . . . or otherwise subjects the prisoner to a substantial risk of serious harm." Talley v. Melby, No. 14-CV-783-JDP, 2018 WL 5266593, at *5 (W.D. Wis. Oct. 23, 2018).

To establish deliberate indifference, the court "look[s] into [the defendant's] subjective state of mind." Petties, 836 F.3d. at 728. "[A] plaintiff does not need to show that the official intended harm or believed that harm would occur." Id. "But showing mere negligence is not enough." Id. "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim." Id. "Instead, the Supreme Court has instructed [courts] that a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm. Id. "Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety." Id.

"A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010) (internal citations omitted). "Whether a delay is tolerable 'depends on the seriousness of the condition and

the ease of providing treatment.'" <u>Cherry v. Eckstein</u>, 751 F. App'x 940, 942 (7th Cir. 2019) (quoting <u>McGowan v. Hulick</u>, 612 F.3d 636, 640 (7th Cir. 2010)). The plaintiff "must [] provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." <u>Petties</u>, 836 F.3d at 730–31.

The defendants do not argue that a broken arm is not an objectively serious condition; they argue only about whether a reasonable jury could find that they were deliberately indifferent to the plaintiff's serious medical need.

a.   <u>Correctional Officer Tritt</u>

Tritt asserts that she is entitled to summary judgment because the plaintiff did not experience a delay in medical care due to her conduct. Dkt. No. 28 at 9. Tritt states that although she may have said "you don't look all that hurt to me," another correctional officer immediately stepped in and called for an emergency escort. <u>Id.</u> Tritt's involvement in this case was limited to that brief interaction.

At his deposition, the plaintiff testified that after his "brief" interaction with Tritt, it "was probably about a minute before, you know, another CO ended up approaching us." Dkt No. 44-1 at 24:10-12, 25:5-8. That other CO escorted the plaintiff to the Health Services Unit. <u>Id.</u> at 25:6-10. Although it sounds as though Tritt's comments were dismissive and disrespectful to the plaintiff, they did not significantly delay or prolong the plaintiff's pain and suffering. Within minutes of his interaction with Tritt, the plaintiff was being seen by the Health Services Unit. No reasonable jury could conclude that even if Tritt exhibited deliberate indifference, that indifference resulted in a delay that exacerbated the plaintiff's injury or prolonged his pain.

12

b.    <u>Nurse Waltz</u>

Waltz asserts that she is entitled to summary judgment because she provided treatment to the extent of her abilities. Dkt. No. 28 at 11-12. In her declaration, she attested that she documented the plaintiff's complaints—pain, a scratch with redness, numbness but the ability to move his fingers, limited rotation of the arm, swelling and bruising. Dkt. No. 31 at ¶9. She documented his vital signs—pain reported as a ten out of ten, normal blood pressure and pulse. <u>Id.</u> at ¶10. She explained that there were no slings in stock, so she gave the plaintiff the only shoulder immobilizer that was available. <u>Id.</u> at ¶11. She also gave him Tylenol, an ice bag, and instructions for resting, elevating and icing the arm. <u>Id.</u> at ¶13. She said that she referred the plaintiff to Dr. Manlove the same day, <u>id.</u> at ¶14, and the medical records confirm that she marked the box next to "Stat. Referral On-Site," dkt. no. 31-1 at 2. Finally, she attested that she did not have the authority to order an x-ray or an off-site hospital or doctor visit. Dkt. No. 31 at ¶¶16-17.

At his deposition, the plaintiff initially alleged that Waltz did not provide him any treatment for his forearm. Dkt. No. 44-1 at 8:19-9:22. He also testified, however, that she put a Band-Aid on his arm, and got him "a bag and a bottle of Tylenol." <u>Id.</u> at 9:11-14. He conceded that she "might have recorded something on paper, you know, later on in like a progress note or whatever . . ." <u>Id.</u> at 26:22-25. He testified that he did not know whether Waltz was the person who called for the doctor. <u>Id.</u> at 27:19-20. He thought she might have tried to see if he could wiggle his fingers. <u>Id.</u> at 30:19-21. The plaintiff testified that Waltz gave him "an empty Ziploc bag for ice that [he] could fill up, and she gave [him] a bottle of . . . either naproxen or Tylenol, whatever it may be," and

that she "tried putting that dislocated shoulder immobilizer on [him], and [he] ended up taking that off." Id. at 32:2-10.

Considering the facts in the light most favorable to the plaintiff, no reasonable jury could conclude that Waltz failed to treat the plaintiff's forearm. She examined him, took his vitals, provided him with pain management treatment (Tylenol, an ice bag and a should immobilizer) and gave him instructions on how to treat the pain. She also made an immediate referral to the on-site doctor. The plaintiff's own deposition testimony shows that Waltz provided the plaintiff with treatment; the real issue is that he does not agree with the treatment she provided. The plaintiff's disagreement with Waltz's treatment "is irrelevant" to a deliberate indifference claim, because he is "not competent to diagnose himself, and he ha[d] no right to choose his own treatment." Lloyd v. Moats, 721 Fed App'x 490, 494-95 (7th Cir. 2017), cert. denied, 139 S. Ct. 253, 202 L. Ed. 2d 169 (2018) (citing Holloway v. Delaware Cty. Sheriff, 700 F.3d 1063, 1073 (7th Cir. 2012)). "As long as [the medical professional] used medical judgment . . . [s]he was free to devise [her] own treatment plan." Id. at 495.

The plaintiff implies that his forearm injury was so obvious that Waltz should have known that his forearm was broken and should have ensured that Manlove provided appropriate treatment (presumably by immediately ordering an x-ray and providing narcotic strength pain medication.) Dkt. No. 46 at 5. The Seventh Circuit has stated that

> [a]s an ethical matter, a nurse confronted with an "inappropriate or questionable practice" should not simply defer to that practice, but rather has a professional obligation to the patient to "take appropriate action," whether by discussing the nurse's concerns with the treating physician or by contacting a responsible administrator or higher authority.

14

<u>Berry v. Peterman</u>, 604 F.3d 435, 443 (7th Cir. 2010).

There is no evidence in the record that Waltz was confronted with an inappropriate or questionable practice by Manlove. Waltz did not have the authority to diagnose the plaintiff's injury. Dkt. No. 31 at ¶18. Only Manlove could do that, and that is why she referred the plaintiff to Manlove. <u>Id.</u> at ¶23. Not only was it reasonable for Waltz to defer to Manlove regarding diagnosis and ultimate treatment; she was *obligated* to defer to him on those issues. The evidence—even the plaintiff's version—shows that Waltz did what she could within her authority and then deferred to Manlove for diagnosis and ultimate treatment.

c.    <u>Doctor Manlove</u>

Manlove asserts that he did not show deliberate indifference toward the plaintiff's injuries because he subjectively did not believe that the plaintiff's forearm was broken. Dkt No. 28 at 12-13. He notes that the decision to order an x-ray is a matter of medical judgment, citing <u>Estelle</u>, 429 U.S. at 107, and that he was "practicing conservative medicine" by ordering an x-ray when he did not believe the plaintiff's arm was broken. <u>Id.</u> at 13. Manlove also notes that although the plaintiff experienced pain for four days, the totality of the medical care the plaintiff received during those four days was appropriate and does not amount to deliberate indifference. <u>Id.</u> at 13-14.

The plaintiff disagrees with the medical care Manlove provided him during the four-day wait. Dkt. No. 45 at 4-7. He argues that Manlove refused him an immediate x-ray and put him on a waiting list. <u>Id.</u> at 5. He says that his injury was worse than what Manlove diagnosed. <u>Id.</u> He argues that the shoulder immobilizer "wasn't for a broken arm," and that he told Manlove that it caused him more pain; he says that Manlove said he wouldn't be receiving

15

any more treatment and that if he didn't leave the HSU, he would get a conduct report. Id. He says that he didn't receive an x-ray until he'd waited four days, during which time his mother had contacted the governor's office. Id. He asserts that Manlove's decision not to x-ray him immediately or give him stronger pain medication "severely caused [him] more pain" because he had to sleep without pain medication or a cast for four days. Id. He says the delay caused an edema which caused him severe pain. Id. at 6. He asserts that once he received the proper diagnosis and had the "improper splint" removed, his injury healed in about six weeks. Id.

"The receipt of some medical care does not automatically defeat a claim of deliberate indifference" if a "prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." Perez v. Fenoglio, 792 F.3d 768, 777 (7th Cir. 2015). The Seventh Circuit has noted, "[r]arely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!' Most cases turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care." Petties, 836 F.3d at 728.

The Seventh Circuit has considered whether a five-day delay in ordering an x-ray for a fractured hand constituted deliberate indifference. Conley v. Birch, 796 F.3d 742 (2015). In Conley, the doctor prescribed ice and ibuprofen for the plaintiff's "throbbing" and "severe pain," but did not order an x-ray until five days later. Id. at 744-45. The plaintiff received the x-ray eight days after that. Id. at 748. The Seventh Circuit analyzed the plaintiff's "treatment notes," and concluded that a reasonable jury could believe that the doctor "strongly

suspected" a fracture yet ordered minimal care. Id. at 747-48. The plaintiff's treatment notes stated: "severe swelling," "loss of function and mobility extending all four fingers and his thumb, even though the blow was to his palm only," "hand was discolored," and "possible/probable fracture." Id. The Seventh Circuit observed that the nurse who wrote the "treatment notes" had telephoned the doctor, at the doctor's home, on Christmas Eve to tell the doctor about the plaintiff's injury. Id. The court stated that the nurse likely would not have done this if she believed that plaintiff had suffered only a bruise. Id. Based on this evidence, the Seventh Circuit concluded that there was a dispute of material fact as to whether the doctor subjectively knew that the plaintiff probably fractured his hand but ordered minimal treatment. Id.

Here, the plaintiff also had a fractured forearm and received a similar treatment (Tylenol and ice), but there is no evidence on the record from which a reasonable jury could conclude that Manlove strongly suspected a fracture and provided "blatantly inappropriate medical treatment." The only evidence on the record showing that the plaintiff may have had a fracture was his complaints of severe 10/10 pain. The plaintiff has testified that he had a one to two inch "scratch" on his arm, "a little" swelling, "a little" redness, and "very little blood." He testified that he had severe numbness in his fingers, but Waltz observed that he could still move them. The plaintiff conceded that there was no bone protrusion or disfigurement. Compare Smith v. Warner, No. 15-CV-633-BBC, 2017 WL 4221094, at *2 and *6 (W.D. Wis. Sept. 21, 2017) (the plaintiff alleged that his hand was "obviously deformed.")

On the date of the incident, Manlove wrote in the progress notes,

No deformity or swelling. Has abrasion mid-ulnar aspect of forearm. Tender mid [illegible] but no palpable defect or deformity Pain [upon] pronation and supination but F.R.O. [illegible]. A— Contusion R forearm. P—ice, sling, x-ray.

17

Dkt. No. 31-1 at 4. Nothing here indicates that Manlove believed the plaintiff had broken his forearm as of the date of the incident, and yet Manlove still ordered an x-ray.

The plaintiff in <u>Conley</u> also had medical expert who stated that the "appropriate" treatment for a possible fracture "would have been to immobilize [the plaintiff's] hand and to promptly order x-rays, to be taken within three to five days." <u>Conley</u>, 796 F.3d 748. The plaintiff in this case received a shoulder immobilizer immediately, and he received an x-ray within four days. Although the plaintiff argues that a shoulder immobilizer was not the appropriate device for immobilizing a broken forearm, he has no medical training or basis to make this assertion. <u>Lloyd</u>, 721 F. App'x at 495 ("[the plaintiff] is not competent to diagnose himself, and he has no right to choose his own treatment"). In any event, Manlove and Waltz both attempted to prescribe a sling, but none were available. Manlove could not provide what the institution did not have. Similarly, the plaintiff's belief that he should have gotten stronger pain medication immediately after his injury is a matter of medical judgment. <u>Norwood v. Ghosh</u>, 723 F. App'x 357, 364 (7th Cir. 2018) ("The district court correctly reasoned that [the defendant's] decision to substitute Tylenol 3 with codeine for Vicodin was a matter of medical judgment, and nothing in the record suggests it was against professional standards of care.")

Finally, the court notes that, "in cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." <u>Jackson v. Pollion</u>, 733 F.3d 786, 790 (7th Cir.

18

2013). Here, the parties agree that the plaintiff sustained no permanent injury from the failure to x-ray and splint his arm immediately, and that the injury did not affect the plaintiff's long-term quality of life.

The court will grant the defendants' motion for summary judgement and will dismiss the case.[1]

## II. THE PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. NO. 58) AND MOTION TO WITHDRAW MOTION TO APPOINT COUNSEL (DKT. NO. 59)

Eight months after the defendants filed their motion for summary judgment, the court received from the plaintiff a motion asking the court to appoint counsel to represent him. Dkt. No. 58. In support of the motion, he stated that his negligence and malpractice claims will require expert evidence. Id. at 2. He also indicated that he'd contacted several attorneys without success. Id. at 3. Two months later, the plaintiff filed a motion asking to withdraw his motion to appoint counsel. Dkt. No. 59. He explained that jailhouse counsel had advised him that he'd filed the motion prematurely, because there was nothing for a lawyer to do until the court ruled on the summary judgment motions. Id. at 1-2.

The court will grant the plaintiff's motion to withdraw the motion for appointment of counsel, dkt. no. 59, and will deem the motion to appoint counsel withdrawn, dkt. no. 58.

---

[1] Because the court is dismissing the plaintiff's federal claims, it declines to take supplemental jurisdiction over his state law claims. See Groce v. Eli Lilly & Co., 193 F.3d 496, 500–01 (7th Cir. 1999); see also Bailey v. City of Chi., 779 F.3d 689 (7th Cir. 2015). Nor does the court need to address the defendants' qualified immunity defense, see dkt. no. 28 at 14-16, because the court is granting summary judgment in favor of the defendants on the merits.

19

## III. CONCLUSION

The court **GRANTS** the plaintiff's motion to withdraw his motion to appoint counsel. Dkt. No. 59.

The court **DEEMS WITHDRAWN** the plaintiff's motion to appoint counsel. Dkt. No. 58.

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 27.

The court **ORDERS** that this case is **DISMISSED**. The court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend either deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 30th day of September, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**